Good morning, everyone. Before I call you to speak, I just want to make sure that the parties receive the order setting forth the time limitations and the order in which the arguments will be presented. We ask that you be very mindful of this time schedule. We understand that there might be questions, but we ask that you stick to it so that we can highly suggest that there not be a lot of repetition in your arguments. We ask that you speak up. The microphones are there only to record and not to amplify. And with that, I ask that the clerk call the case. Case number 14-6535.  Good morning. I want to call Esquizito for GES. First, I have to talk about duty for a few minutes if I could. Every duty must have a source, and when you're dealing with a voluntary undertaking, that source must be the defendant. There must be some affirmative acknowledgement from the defendant, from a contract that's signed, from words that's spoke, from conduct that it took, to indicate that it is the undertaking of duty to the plaintiff himself. We had an undertaking here. That undertaking was to be a logistics provider. We were brought in by ASI to coordinate the setup, the running, and the takedown of the show. We had work to do at the show. We were the exclusive mover in and mover out, if you will. All equipment came and moved through us. We did the carpentry. We did the decorating. We did the electrical. We did the plumbing. That was our work to do. Why don't you talk to us about what your duties were as to safety and more pertinent issues. As best as safety, first of all, was to deal with our own employees. We had a number of employees on the site, and we had to make sure that they were operating safe, that they were using safe tools, they were using safe equipment, they were using safe methods. We had to do that. As to the rest of the show, our undertaking was merely to say something if we saw something. As we worked, as we walked the premises, if we saw something that was unsafe, we should say something about it. Say something to the person who's involved. If they ask for their compliance, if they don't do anything, say something about it. Who was Mr. Jackson? Pardon me? Who was Mr. Jackson? Stan Jackson was our safety guy on the job. Start correcting me if I'm wrong. Sure. He testified that Global's responsibility included the safety program to see that Metropolitan Appearance Rules were complied with. He was aware that Metropolitan Appearance had rules governing scooters. He said that Global had the authority to take action on violations of Metropolitan Appearance Rules that he became aware of, and that he knew that ASI hired Global to enforce Global's safety program. Did he testify to all that? I think he did. And he's your agent? He is our agent. And certainly, keep in mind, we have a lot of employees on this job. We are a safety conscious company, even our expert admitted that. So we, as if it's head of safety manager, to make sure that what we're doing is safe. I mean, we've got a responsibility. He went a little further than that. He said you had an obligation to see to it that Metropolitan Appearance Rules were complied with. He had an admission against interest. No, not at all. Because we do have an obligation in terms of our own employees, and as to anyone else that we happen to see doing something wrong, we have an undertaking to say something about it to get it all corrected. And generally speaking, I think he also testified that when he did say something, people would act. They would react. They would work to correct the situation. He also said that he understood that part of his duties was to see that Metropolitan Appearance scooter policy was complied with, but argued that he never saw the scooter involved in this case. Correct. And that he traveled around the show looking for and correcting safety lines. He did. I mean, it's true, Your Honor, and it comes in the context of what the overall undertaking was, to deal with GES employees and then to see. I've heard this man's testimony. This man did not restrict his duties to GES employees. No, he didn't. He didn't. But he also did not say, Your Honor, that his job was to take an active role in safety. I mean, it wasn't GES's job. What did he say was his job? To hold toolbox talks. To sit down with EACs, who he declared that he was responsible for, by the way, and explained by contract to say, okay, let me see your tools. Okay, let me see your carts. Let me do that. There was not that active undertaking. What everyone recognized was that everyone's responsibility, this comes from Dave Crossman of McCormick Place, everyone's responsibility was to see something, to say something that they saw something, that includes McCormick Place. They were all involved in this. He said that GES was to take action if they saw a problem. With its own people, if we had a cart that was not properly certified, we had an absolute obligation to go and get that cart certified. If we saw a cart from someone else who wasn't certified, then we had a responsibility to undertake an expectation that we would go and report that to that person, say get it certified, that they were going to take action to report it to McCormick Place. Okay, so you accept that duty. Oh, yes. But you don't think that that duty was either violated or led to the injuries here? No. It was violated? No, it wasn't because our undertaking was limited to what we actually saw. According to the plaintiff's expert, he would have been a blind man not to see it. He testified that he questioned the veracity of Jackson's testimony that he never saw the scooter and the amount of time that the scooter was in operation for a couple of days, he would have had to have seen it. He said the absence of a current inspection sticker in condition should have attracted attention, and he also indicated that not only could you have told Coastal to remove the scooter from the floor, if they refused, you could have had it removed yourself. That was his expert testimony? That was his expert testimony. The expert also said there's no evidence anywhere that anyone from GS actually saw the scooter. But wasn't the jury entitled to make that finding based on the circumstantial evidence? Yes, because there's no foundation for that. I mean, you need evidence. You need foundation evidence. I mean, if there was an expert out there right now, could I say, you guys saw V3, you saw V4, V1, V4, you're staying close? You need foundation evidence that people were in a position, people who were trained and had authority to do something about it, to do something. Let's keep in mind here, it's important to keep in mind the dynamics of this show. This show was being operated in an area of a half a million square feet. It was operated with 700 booths crammed together like sardines, in a grid that destroyed sight lines, with hundreds of people on the floor, with over 100 carts and mechanical lifting equipment and forklifts, with people with no evidence how many GS people were on the floor. That wasn't offered. Keep in mind that this cart is a moving vehicle, and the purpose of the cart is to transport tools of the workers, and the equipment to get them from one place to another in this 500 square foot area. That cart could have been moving at any point in time, so you don't need to get nervous. I suppose your opponents are going to stand up here and say, if you undertook to have a safety manager, whose job it was to travel around the show looking for and correcting safety violations, including enforcing McPeer's policy, and he didn't see this scooter, he didn't do his job. That's what our opponents are going to say. But the problem is, it's not in the contracts. I'm not talking about contracts yet. I'm only talking about what Jackson said was the scope of his duties, and he is your safety manager. Right, he's our safety manager, but he wasn't saying that he had a duty to find things that were invisible, and let me correct that word, it's not visible, that he didn't actually observe. It wasn't his job to go under. They're saying he didn't look. He wasn't looking. He didn't do what he was supposed to do. Well, he was supposed to travel around looking for and correcting safety violations, and they're going to stand up and say he didn't do it. Right, and the problem is, just because you're walking around correcting safety violations, he may not have seen this because he was correcting a safety violation. He may not have seen this because he was doing something to help a GS employee. I mean, this isn't like a policeman who's put on a checkpoint, and his job is to stop a car and to check for sobriety or check for a seatbelt. This is a very dynamic process. There's action going all over the place, and if you see something, yes, and yes, they undertook to correct it, as did everyone. That was the expectation of everyone. Dave Costner said that, even his own staff. So if they did see it, great, do something about it. And a guy can say, well, he should have seen it or he would have seen it, which is basically what Feenstra was saying. He would have seen it. Feenstra also said that the area is 400 square feet. If nothing else, we'll, if you don't mind, counsel, we'll move on. Thank you very much. So at this time, the plaintiff has 10 minutes to respond. Good morning. My name is Leslie Rosen on behalf of the plaintiffs. I will be arguing this part of the appeal, and I will be arguing the cross appeal, and Mr. Durkin will be arguing the other appeal on the indemnity, the agreement. Obviously, you understand the record completely. It's very clear. They've admitted they had a duty to remove something if they've seen it, and as you said, Justice Hoffman, they should have seen this. I want to be clear about something. Yes. You're not suggesting they had any contractual obligation to do this, are you? Yes, I am. Could you please tell me where you suggest in the contract and which contract obligated them to do this work? Okay. Mostly looking at the exhibition agreement that GDS drafted and entered into with ASI, which said that GDS was the exclusive provider of all services for the show, but not limited to equipment and labor of all material handling services. Not a word about safety. Not a word about safety. But then there's the safety first document, which appears in the effect joint appendix in A23. It says treat this as a construction site, and this is GDS's document, and bring anything that you see that's unsafe to our attention. So I think that's a part of the contract, but there's tremendous testimony. Why is that part of the contract? And why is that part of their obligation? They agreed to it, that contract. What? Bring to their attention anything they see? To treat this as a construction site. Yes. And they tell everybody on the floor, if you see anything, bring it to our attention. We are the ones. So that is deemed part of the contract. It's not exactly the GDS site. Give me a citation in any one of these contracts that says that they were obligated to enforce metropolitan peers' scooter rules for registration or for safety. You can save your time. There is none. I've seen them. I've read those contracts. There's absolutely nothing that says they're supposed to do it. I'm sorry. Let me say it's in the licensing agreement. They agreed to this, though. I'm going to skip that because all I have is the official contractors. They may have agreed that they would comply. They agreed. Everything is under their control. The exposition floor, the aisles, the loading tacks, the service and the storage areas are all under their control. For what purpose? It doesn't say exactly. It does. It does. It says that they're there to set up, to tear down, to install things. What about the orderly and efficient installation and removal of all of the material? Orderly and efficient. I think it could be said so. That's a little stretch, Ms. Rosen. I think you'd better get on to the bottom of that. Let me get on to the testimony. You cited Stanley Jackson, who considers himself a mall cop. You've talked about David Costin, who's the general manager, and that he said that GES was required to enforce the MPEA safety requirements, that's in volume 123, page 51, and that the MPEA contract with ASI also said it. So the question is, then GES enters into a contract with ASI. I want to just point out on this point, they say, ah, you can't look at the contract with ASI because they got out and there was summary judgment and it's the law of the case because you didn't appeal it. Just as an aside, it's a small point, but it's important. That's not accurate. It is not the law of the case. If you look in the record, you see that – Pardon? We know it's not the law of the case. Okay. Okay. Thank you. Okay. I'll move it on. We'll go on to the other testimony. Mary Upton, who was from ASI, testified that GES was responsible to do it, and as you see, the show was safe. That's Mary Upton's evidence deposition, volume 98, 24335. She said the scooter was a wreck. It was obvious, and she expected GES to enforce safety. According to Ms. Upton, she said that Global was responsible for safety, but it was limited to its own scooters, not to coastal scooters, unless they actually viewed the problem. Okay. And that was her testimony. Okay. And they admitted that they saw that they had an obligation to remove it. Our expert testified that their testimony, that they didn't see it, was inconsistent with what he knows to be true. All right. Mr. Esposito got up here and said there was no foundation for that testimony, but if you look at the record, I do not think there is any objection to the testimony. There is certainly none in the trial. There is no foundation for the jury to conclude that they should have seen it or must have seen it. Does they have an obligation to object to the testimony? I think when it's coming in, I don't think there was no objection to it at all. And Mr. Feenstra's testimony, and Judge Lyons felt that the jury, it was ample testimony for them to rely on that. Really, what they're arguing is not so much a duty question as a proximate cause question. They're saying, we had a duty to remove something if we saw it, but we didn't see it. And that's really. . . It's a breach of duty. It's a breach of duty. It's a breach of duty. Okay. It's a breach of duty question, which is a fact question for the jury. It's not a legal question. Which is what they're trying to pass this off as a legal question. It isn't. And there's ample testimony because you know this testimony as well as I do, maybe better. Charles Gruzard also testified that they were to work with ASI to create a safe environment that's in Volume 112 to 11. And then he said, we don't know how many people were on the floor, GES people. Well, the MPA guy, I think there was testimony there were hundreds of people, GES people, hundreds, on the floor. Eric Bergerland, who was the driver of the golf carts and scooters, said that they were always on site. And when he drove the scooter on the floor, GES was all around. It's a breach. It's a breach of duty here. Most interesting to me, you should know the jury instruction here, which is agreed to. The jury instructions were agreed to. Judge Lyden commented on it in Volume 108, page 237. The issue on the pleadings, there were three allegations of negligence. GES failed to supervise the setting up of the show to ascertain the presence of unsafe carts. They allowed unsafe carts with out-of-date inspection stickers to be operated on the premises when it knew or should have known. They're just talking about knowing, but it's also or should have known. And that's an instruction they agreed to of the cart's unsafe condition. And they failed to notify MPEA of the presence of an unsafe and out-of-inspection scooter when it knew or should have known of the cart's unsafe condition. So the issue is broader than they're telling you today. They say they're talking about 324, a statement of torts. They don't mention that in their closing arguments. They do briefly say that the fault lies with MPEA, but this is after they blame Mr. Jarkin and Mr. Lindjoff as the sole proximate cause of this matter. Ms. Rosen, let me ask before you step down. What's the status of the industrial commission claim as we sit here today? Do we know? I'd have to ask the Tribe Council. Do we know anything about the industrial? All right. Thank you. Okay. Okay. So, if Mr. – that's all we're talking about. I think you've got this down. Thank you very much. Thank you, Counsel. That brings us to COSTO. May I please record? Good morning, Your Honors. My name is Terence Guerrero. I represent COSTO. The issues in GES or PRS to COSTO are derivative, given that I'm a third-party defendant, and obviously were not raised in an oral argument. So with the time I have, I would ask if there were any questions from the briefing that I could address. If there is no oral argument on my issues that I need to respond to. Well, you're arguing against what your program is sharing? Well, the main issues are GES has raised in their appeal that the court should have put a dollar value on their contribution judgment against COSTO. You'll argue that in response to their appeal, will you not? Yeah, that's why. What are the issues in your appeal? The issues in my appeal are on the denial of the motion for good-faith finding on a settlement that we had with the plaintiff. If I may, that's the point. Well, as I understand it, your settlement was contingent upon a good-faith finding, was it not? There are good-faith finding rules of contingency. The issue that we've raised, and I believe that we have support on this, is that that is not an escape hatch. Certainly, we were seeking a protection of a good-faith finding because we were putting all of our available insurance coverage in. What's an escape hatch? What purpose did it serve being written into the contingencies? Well, the purpose was that in COSTO, by offering the million of employee liability policy that it had available to it, keep in mind that there are other coverage that GS has grabbed onto as an additional insurance, so COSTO doesn't have access to that. So the only coverage we had was the $1 million EL policy. In offering that, if we're not getting a release and satisfaction from the other claims against COSTO, that gives us the right to drop out. There's nothing affirmatively that gives the plaintiff the right to drop out of that contingency. Hold on. The judge had a little part to play in this, too, on the question of good-faith finding, didn't he? Yes. You were going to pay $1 million and waive your comp lien on that $1 million loan. Yes. You're retaining lien rights on all recovery in excess of the $1 million. Well, there's a distinction I have to raise, Your Honor. Is that a yes or a no? Well, I would say it's a no, Your Honor. COSTO doesn't have control over the lien. COSTO's insurance carrier, the Hartford, does. I do not represent Hartford on the subrogation. I think COSTO has a lien, and they're subrogated to it, aren't they? The Hartford, by way of its subrogation, they control that. They were represented throughout this litigation by separate counsel. But the Workers' Compensation Act doesn't give the Hartford the right to enforce the lien. It gives the employer the right to enforce the lien. You may have a contractual relationship with your Hartford, but it's your lien, not theirs. Second of all, in exchange for the $1 million and your waiving your lien rights on the $1 million, which I take you have the right to do, you get out of, or you retain your right to enforce lien rights that could be as much as $13 million. Isn't that a very good deal for the plaintiff? Well, at the time, Your Honor, and actually as we sit here today, the liability of plaintiff against GES was uncertain. So our potential liability in the case was zero. You know, if this Court were to sustain GES's appeal. I'm going to get to the other question. So on the appeal that you raise as to your pro rata share? Yes. Was there jurisdiction to decide that? Well, if I can just touch base on just the one issue, and then I'll get to the jurisdictional. As to the good faith finding on the settlement, at the time of settlement, when the Court is supposed to review the issue of good faith, our potential liability, COSTA's potential liability, had a low of zero. So the million that we offered, depending on how this appeal or future appeals would go, could turn out that we paid $1 million with having no liability. Plaintiff made statements. Assumes Global pays nothing? Well, if Global's appeal is successful, the 75% share of liability that COSTA has on their contribution claim falls away. And part of the GES's appeal is they wanted a dollar number put on that. That hasn't been raised. And I'll stand on my briefs on that. As far as the good faith finding goes, we offered that million, and that could be the only recovery. And there's statements in the record by plaintiff counsel as to the good faith nature of that, the reason they wanted that money so that they could get the plaintiff into a better housing situation. They had an interest in doing that. And that was how the settlement came about. As to the jurisdictional issue, Your Honor, I think the Brandon Clay case is very clear. When there was not an agreement between the parties as to the value of the future benefits, the place that that belongs under Section 19 of the Wood Compact is with the commission. I don't know if the commission is asking whether we have jurisdiction. I don't know that we have jurisdiction, but the industrial commission is never going to decide what the value of that claim is. The industrial commission is going to enforce the act, order a certain amount of money per week for life. We don't know how long he's going to live. There is absolutely no way to definitively determine how much that lien is going to be. The only time the industrial commission does it is if they approve settlement contracts. And then you'll have a definitive amount of money because it's going to waive future payments. But the industrial commission doesn't make this determination. The parties could seek them to do that. As to the appellate court's jurisdiction, the trial judge in this matter has made a finding in an order setting forth that our potential liability is 75%. And he has made a determination. Now, what is our jurisdiction to review that order? That is a separate action of global versus coastal, is that right? Yes. And the 75% is decided. Is that a final order? How do you enforce it? Who do we execute on for that order? Well, it may be something that, depending on this appeal, may become right, but... How does it become right? Until somebody puts a dollar amount and there's a judgment on it. Well, I think the process that would be followed is what the Seventh Circuit did following Van on stating that matter and requesting the parties to get a determination from the World Comp Commission. That's the only way that we're going to follow the statute and end up with a number. No, you're going to end up with a number when global pays more than its prorated share, and global goes after coastal for anything in excess of its prorated share and receives judgment for it. That's when you're going to get a final order. Right now, you've got a percentage, which is not a final order, and you can put 304A findings in non-final orders all day, but in the words of Judge Murray, you can paint stripes on a jackass, but it doesn't make it a zebra. That's right. I mean, you know, it's a non-final order that cannot be made final by a 304A finding. So, I don't know what this is. I would say then, Your Honor, if that is the eventual position of the court, that does not dovetail back to any way bootstrap and support GES's argument that there should be a set determination as to the value of their contribution claim against coastal, because GES to date has not paid the $5 million plus that would be their prorated share. They have not made payments, so the 75% must stay vague, and that's part of why I'm raising this issue in GES's appeal, because that's part of their appeal here. The court may well be right that, from a jurisdictional standpoint, there's an issue here, but that's part of GES's appeal, but I think just under the statute as they exist, to place a number on that, one, is not the province of the trial court, but it certainly is not something where they should have a contribution judgment against coastal when they haven't paid anything to the plaintiff. I don't understand this notion of asking the Industrial Commission to put a number on it, because absent its statutory right to enforce the Act, order the weekly payments, plus ordering all future medical, whatever that may be, they could approve a settlement, which would give you your fee, but I don't know where anyone would get the right to invest that amount of power to make the determination that you're suggesting they should make. It's a pure creature of statute. It can only do what the statute allows it to do, and the statute doesn't allow for this. Well, I would refer to Section 19. It places the determination as to the value absent an agreement within the Industrial Commission. It doesn't say value. It places the determination as to the benefits that are due. Right. But this guy's a permanent total. This isn't the guy that's asking for a scheduled recovery, so many weeks for loss of the firm. This is a permanent total. This man gets benefits for the rest of his life, however long that may be, at two-thirds of his average weekly wage per week, plus all future medical expenses, whatever they might be. There's no way of making that determination. That's not possible. Unless someone takes his mortality table and then makes some type of a guess, and somebody did make a guess, I think between $18 and $20 million or something to take care of this man, depending on whether he goes into an institution or not, and someone makes a determination that that's an acceptable method of determining what your long-end liability is. But the fact of the matter is the Industrial Commission does not make that decision, unless there's a settlement, in which case they're going to. Again, I would have to defer to the statute. It places that within the commission, the value of those benefits. Yes, the Industrial Commission is making a determination as to the value of those benefits. When you say the value, where do you get that from? The benefits to be paid to a permanent total are found under Section 8F of the TTD rate, and it's a rate for life under 8 to B, two-thirds of the average weekly wage, plus an annual rate adjustment under 8G. That's what he gets for loss of wages. Plus, he gets 100% of his medical for the rest of life. Where do you find any language that says it's right to determine the value of that except in settlement? In the statute, it is not. But to make that determination, again, the statute talks about that it's going to be done at the commission, where the facts are there, where the parties that are dealing with the work comp benefits are there to educate the commission regarding the value. For the trial court to make that determination here raises the prospects of two effective different values being used, and in a third-party defendant situation on an EO policy, when that determination, and certainly the ruling of this court is going to affect cases that go beyond the catastrophic-type injuries that Mr. Lindroff had here and the full-life-type benefits that we were talking about, the decision as to who makes that determination as to the value of the future benefits is something that's going to come up. And right now, the statute says that has to be before the commission. With that, thank you, Your Honors. Mr. Cawley, you have some references in your brief to insurance coverage litigation, but no one supplied any case numbers. Is there still litigation? It is. And the purpose of that, Your Honors, on the good faith finding, part of Coastal's showing was to document that the only policy Coastal has available to it is the $1 million liability policy. GUS, as an additional insured under our CGL liability policy, as well as our excess policy, has claimed that, and given the amount of the judgment, if they're successful in the declaratory judgment action, they would use all of that funds. So Coastal, as a third-party defendant, has $1 million, and that's what we offer, and I've cited various cases where the court looked at that as an indicia of good faith. So to answer my question, there's one case, and it's still pending? There's two cases, actually. There's a GS declaratory as well as an MPA. Are they both in Chancery? Yes, in Chancery. And there's also a Federal Interpreter for full answer, but that's separate and apart. Thank you, Your Honors. Thank you. Dave Cossman said, Dave Cossman being from MPA, said that it was not our responsibility to arrange to get EAC cuts inspected. Mary Epton said it was not our mission to search for errant cuts. We were out there to put together a show, and if we saw something, we would say, if there was a problem with our workers, we had to address it. That wasn't with our workers. Foundation, the foundation I'm referring to is the foundation to reach a jury conclusion. It's no different than saying, you know, you've pled a complaint, and these facts are pled in the complaint, and a motion dismisses that. So, you know, based upon these facts, you can't draw a conclusion upon it. It's no different. The facts they put out don't establish that we did something wrong. The comment about there were hundreds of GES people on the floor, that's just going wrong. What the statement was, there were hundreds of people from GES, ASI, McCormick Place, decorators, vendors, all sorts of people. The group, the combined group was hundreds of people. The statement that the truck is driving all along proves our point. It was driving all along. This is not like a lettuce leaf that's on the ground that sits there for half an hour or an hour or whatever. This cart is moving. Every time it moves, you're restarting the constructive notice clock, because it's not in the same place where it used to be. Couldn't it also be argued that every time it moves, it exponentially increases the likelihood that a GES person is going to notice it, because it's moving around into the presence of more and more GES people, and it goes around McCormick Place. Again, you run into the problem of foundation. All GES people on the floor, they come from unions. They're decorators. They're painters. They're carpenters. They're electricians. They're plumbers. These are not people that are trained to do the kind of job of saying, Hey, you're not certified. You go in. The people that you're talking about there is operations people, and the problem is you don't know what those operations people were doing at the time the car was there. I mean, a police officer can be writing a ticket to someone, and a speeder goes right behind them, right behind them. They were within feet of each other. But what is the foundation to say that this officer should have seen this person? That's the difficulty I have with this kind of argument, Mr. Esposito, is I've looked at the pictures. I mean, this car is basically a giant piece of rust with wheels underneath it. It is rusty. Yes. Anybody with common sense would say there's a problem. It's not an issue of a tiny sticker being missing. Well, except that the expert says a rusty car is not an unsafe car. It didn't need to be pulled over because of rust. I mean, there's rusty cars out in the world all the time. I don't think it's the police officer's responsibility to pull them over and say your car is rusty. Maybe ASI wouldn't like it out there during the day of the show when you've got the public out there, so what are you putting up for? But rust, as the expert admitted, does not make a vehicle unsafe. The problem was you had to have a foundation that someone would be seeing a sticker that was about six inches square in the dynamics of this beehive of activity and have seen it, have known that this was wrong, have known that they should be doing something. That brings down the number of GES people quite a bit. And keep in mind, everyone has the same duty. We're being blamed here. Why do ASI get it? Why do McCormick Place get it? We're the only ones that are being held to blame for this stuff. Well, speaking of McCormick Place, since this is your last chance, hold on, let me ask you a question I'll ask everybody. If we were to reverse on the tort immunity issue and find that the Judge Savage improperly granted summary judgment to McPhere on the simple negligence counts, what do you believe the relief should be with respect to everything else that's floating around in this case? If we were to reverse ISMPEA? Right. Do we hit a reboot button and start everything over again? Do we preserve the amount of the verdict? Do we preserve the contributory negligence percent? What do we do? What is your position on that? To tell you the truth, I haven't given that a lot of thought. I mean, we have our own PA. We're a separate party from MPA. That's what he thinks, too. Yeah, we're a separate party from MPA. If I could, I'd defer that one to MPA to figure out how that kind of situation would impact them in terms of, I guess, what we're talking about. I don't want to give off the answer yet because that could be wrong. I don't think it's fair to anybody. It's a question that everybody should have a crack at. It's not necessarily just an important question. At the time, I couldn't answer the other issue that could take you. Our position was Kentucky. All we're asking is, what would be the amount under Kentucky that we're limited to in contribution? We can't call if we haven't paid. I mean, it's clearly that. But that's all being an imposter motion. You'll be limited to starting when you pay more than your prorated share, more than your 25%. You will be limited to whatever their obligation is in workers' compensation. Past and future. Past and future. And so I suppose when you deal with a permanent total who's going to get payments for life, you get a variety of judgments as once you pay out more than your prorated share, as they pay more than that, up to the amount that you've paid to that day, they collect that and they can come back for more. Right. And our problem with what the trial court did here was the trial court said, we are limited to the amount of money that has been paid by Coastal in workers' compensation. As of the day, we pay payment. You have something we pay payment for. We think that's totally wrong. He's wrong. So that's easy. I would not argue with that. Okay. Because the Supreme Court makes it very, very clear that you are liable for present and future obligations. That's all I have to say. That's what we said. Thank you. Okay. Thank you, Councilman. Which brings us to Coastal, I believe, correct? And this is your argument on good settlement and a good pay? It is, Your Honor. And we certainly touched on the high points of that already. Justice DeLords, to answer your question as to if there's a reversal on the MPA issue, from Coastal's perspective, I think it would have to be a reboot, because right now we're subject to 75% liability as to GESs taking 100% of the total liability, minus, of course, the comparative negligence. Then tell me, how did that come about? How did these verdict forms come about? There was a verdict form A, and I don't have the record citation. The attribution is supposed to be determining the proportionate fault towards the plaintiff. Why was this? We followed the IPIs, and there's a verdict form A, which determines the liability between plaintiff and the direct defendants. And as to each direct defendant, then there's a verdict form B, determining what share of the liability, because, again, as a third-party defendant, So what does that mean? When I look at the IPI instructions, it says each person who is liable for the plaintiff's injury, a percentage gets laid out. That's not what happened here. We are only in the case as third-party defendants. Yes. I understand. So this all arises because the plaintiff, for some reason, decided not to sue Coastal. Well, they can't sue Coastal under the exclusivity. So we're a third-party defendant, so our liability is only in the contribution claims that were filed by GES and MPA against Coastal. To the extent those defendants would share any liability, would have liability to the plaintiff after a comparative negligence. Well, what were the jury instructed to do? I mean, what is 75%? What does that mean? Well, in effect, what it works out to is roughly 48% of the total liability on GES's claim. So what they're saying is Coastal is false. In the overall breakdown, that's what it works out to. Was the jury adequately instructed to make that determination? There were instructions on that. The IPI verdict forms were used. It didn't look like IPI instructions in any way. It's very close to me. If Coastal is dropped into the direct line of liability from the plaintiff, that would block Coastal's protections against a direct action of the plaintiff. So our liability is derivative as an employer, and that is the ruling of the trial court, and I think that's the way to do it. Can I ask a question? Your brief seems to be lacking a standard of review on your appeal. What do you contend the standard of review is? On which question, Your Honor? On your appeal. On the question of good faith finding. On the question of good faith finding, we would believe that. I would say that that's an abuse of discretion standpoint. Is this what the plaintiff says? I mean, that's what the Supreme Court says. So the denial, the trial court's denial, in order for us to reverse it, assuming we're in jurisdiction over it, to reverse the denial of the good faith finding, we would have to find a no rational trier of fact that would have refused it? Your Honor, I would submit that here you have a settlement for total policy limits that the plaintiff's representative in court has vouched for as good faith, and made statements regarding the benefit to the plaintiff, and actually, as I said earlier in the earlier argument, the one million at the end of all of this could still be all that the plaintiff would have had. But we have a plaintiff, an underlying plaintiff, who's an incompetent, and the court does give some obligation for it. Now, it occurs to me that, as I understand this, and I could be wrong, but you're going to pay a million dollars, you're going to waive your lien on the million dollars, and you're going to retain the right to lien on anything paid over and above that one million dollars, which could, based upon the estimates of their expert, rise to the level of $20 million. So the plaintiff is going to get a million dollars today, and you're going to be able to exercise your lien on $19 million that he collects in the future. And maybe the trial court thinks that's a pretty bad deal. Well, I would say this, that throughout that entire time, and I think we're due to part in terms of whether this is coastal. It's the work comp carrier that has the lien, and they've enforced it. Hold on one second. You keep saying that, and you are dead wrong. Read the Workers' Compensation Act. The Act says the lien belongs to the employer. You are the employer. You may have an insurance policy that says that they're subrogated to your rights, but the fact of the matter is the Act says the employer has a lien on all proceeds from a third-party action. Well, I would say this, Your Honor. In addition to the million, there's an ongoing commitment to pay workers' comp benefits, and the whole idea of the Kotecki Doctrine, as it has evolved, is the idea that there should not be a double recovery against the employer, and that's ongoing. So plaintiff is going to get a million dollars fresh as well as an ongoing work comp benefit under the statute. So it's not just the million dollars. In the contribution judgment against coastal, again, it's 75 percent of GES's adjudged fault. That can be worth zero. So the idea that we are, to use your term, escaping that, well, that's dependent on the result of GES's appeal. At the time that we made this settlement, that was nowhere near in dispute or nowhere out of dispute. In fact, post-trial motions were still pending. Counsel, you could have been praying that we reverse outright the plaintiff's verdict against GES because then you'd never have to pay contribution, period. As a third-party defendant employer that is burdened with work comp benefits on an ongoing basis, that is our position in the litigation, and that dovetails back to the question about the verdict forms. Our liability is only derivative of plaintiff's claim against the direct defendants that they're entitled to sue. To put us in their verdict form would obliterate that immunity that an employer has under the deal that's stricken under the work comp act, that you have a no-fat system of payment for as long as that may take. And then I think we all agree in this case that will be for the natural life here. So I did quite a little bit in terms of the escaping language, but I would stand on my brief on the other issues. Thank you, Honors. Thank you. Good morning, Justices. Al Durkin, on behalf of the plaintiff, I'm assigned to respond to Coastal's appeal. It seems like a lot of the questions have been asked here today. I'll try to be brief. The plaintiff simply said Judge Lyons did not abuse discretion in denying the motion for good faith finding. He knew the totality of circumstances. This is a judge that was actively involved in this case from the moment it was assigned to him. There were mediations set with Judge O'Connell that he deferred to trial styling with. He worked with us. He handed motions in limine. He sat through a month-long trial, heard all the testimony, heard all these same arguments, and was aware of the circumstances of my client. And he, in his ruling, did say that under the totality of circumstances, he could not approve a good faith finding even though we had withdrawn from it. But even if we had not withdrawn from it, he would not approve it based upon his own special duty doctrine to a disabled person such as Mr. Lindroth. Having not approved the good faith finding, the good faith finding was one of the conditions preceding to the alleged release and settlement agreement. There were four prongs to that. I think Justice Hoffman may have mentioned them earlier. First, where they paid a million dollars. I'm going to move over now to the unilateral withdrawal or whatever. A million dollars. The second was that GES would get a full $1 million set off from that payment. And that's important, too. The third was that they were going to waive the lien toward Hartford. And the fourth was the good faith finding. We know the good faith finding never came to fruition. So for that reason alone, there was no settlement. But moreover, when GES interposed an objection to the settlement by setting forth that they would be claiming that plaintiffs would then have waived any claim to collect against GES by taking a million dollars, it was at that point that we withdrew any possibility going forward. We did not want Mr. Lindroth to assume that potential risk. And that was also a reason that Judge Lyons found that in the potential for a draconian, I think was his quote, result, he would never approve a good faith settlement. What was the theory under which accepting a settlement from Coastal would have waived the liability of Global? Who came up with that theory? Mr. Esposito, I believe. He came up with a theory that under certain cases, Yoder or Stickler. I'll be honest with you. I've been around a long time, 38 years. I predate the contribution statute. This would have been the first time that I had ever entered into a proposed good faith settlement after a verdict. And I will throw myself on the mercy of the court. I'm not omnipotent. I did not foresee that as a possibility. And as soon as that was raised, I engaged appellate counsel. We looked at it and said, well, it's a gray area. It's a potential. If it's a potential, we're out. And I would like to analyze or analogize these circumstances to, let's assume, Justice Rochford was selling a home. And Justice Hoffman said, I like your home, Justice Rochford. And I'm going to offer you your asking price. But I have a couple of contingencies. First, I have to sell my condo in the loop. And I need to get a mortgage for the difference between what I get from equity out of my sale, my condo, and the difference in the purchase price. Now, any of us that have ever sold a home know that that agreement is not enforceable until those contingencies are met. And Justice Rochford certainly would have the right during that time period to continue showing her home and selling it to another buyer who did not have similar contingencies. So to say that you never bought something, I think, is not accurate. He also said that since the contingencies were never met, there was no settlement to be enforced. I'm here to answer any questions you might have because you've asked Terry and the other people questions regarding the good faith nature or the lack of good faith. I am at least one of the persons that are here today that have lived this case for almost 25% of my professional career. We are litigating. There has been litigation in the chancery courts, in the federal courts, in the circuit court, and every way I've fought on behalf of Mr. Lindroff, who is a disabled person. And there is a comp case still pending. And they are still paying the benefits. And it's my understanding, I'm not working as a comp lawyer, but I believe in this case, when GES pays the judgment that it owes, that those comp payments would cease. And at that point, GES would have a right to go against Coastal to recover or reduce or whatever we're talking about their 75% contribution. I think they're severally liable. Why do you believe that once they pay their verdict, the comp payments are going to cease? That would be true if there was a schedule of loss payment, where it's absolutely determined what their obligation is going to be. This man does not lose his right to workers' compensation benefits for life merely because they pay their verdict. I have been told. To answer your question, I merely, it's hearsay to me. I've been told by the work comp attorneys that what occurs under those circumstances is that comp gets a vacation from payment until the monies have been exhausted, and then they have to start paying again. So it's only a temporary relief. This is not a total realization we're talking about. You can go through this money in five years, ten years, whatever. We don't know that. No, it's not a total loss. Their obligation under comp is for life. Will continue, yes, sir. Unless they suffer. Yes, and that's, you know. It's kind of tough. It's tough when somebody has the type of disabilities that Mr. Lindroth has. I think you had another question about what happened with MP. I don't know if you want me to answer that question or leave it for Leslie or whatever. It's up to you. I'll leave it to you to decide. I figured Ms. Rosen would address the natural argument, and she's nodding yes. Okay, then we'll leave that to her, but I know what I believe would happen, and she better say the same thing when she's fired. Any other questions for me on the course for good faith family folks? Thank you very much for your kindness, and obviously having read all the material, I do appreciate it. Are you sure you want to come back up? You've got a few minutes. What I would say, Your Honor, just on the issue, just to soften the raised issue as to the theory of the set-off, the Yoder case was in existence at the time of this settlement. Not knowing that case law would be a unilateral mistake, and I would think that that is not a reason to be able to back out of the settlement. With that, I think we've explored everything on my case. Okay, thank you. This brings us to Ms. Rosen. I guess you better have conferred before you come up. We've discussed this. This is a major issue to us. We don't want to take any risks, and we don't want to lose anything. It's our position that if you reverse on the negligence counts, we go back for a new trial against MPEA only. The damages are set at $35 or $34 million. If MPEA is found as false, they are entitled to a set-off of $22 million. There's only one or two options. You're going to have to walk me through this. Okay. Are you arguing about the judgment on OB request? Yes, ma'am. I'm sorry. First of all, there has to be a new trial against MPEA on negligence only. Okay? It is not an academic question. We believe the case law is clear. You get one recovery for an injury. The damages in this case for Mr. Lindroth have been set by a jury. That's set. Okay? It's $34 or $35 million. GES has been found as false, $22 million. That's 35% compared to false by Mr. Lindroth. GES was found 65% at fault. Which I don't know. I wasn't trying to give up protective protection. GES was found 65% at fault. Mr. Lindroth was found at fault. By a jury. By a jury. That was instructed at a trial where the negligence counts were not in play. Correct. Does that change the calculus here? It changes the calculus. We're requiring a retrial against GES. No. We do not want a retrial against GES. We believe that the damages for Mr. Lindroth are set. One injury, one recovery. Okay? And no one's contesting the damages. The jury is that Metropolitan, although they weren't even under negligence, they certainly had the opportunity to defend themselves against the damages claimed by the plaintiff up until the point in time when the jury found them not guilty worth the want. Absolutely. So they had their trial on damages. Absolutely. Everybody's had their trial on damages. Right. And nobody's contested damages. The only reason, if it goes back, if it were to go back on negligence, would be to establish the percentages of fault. The percentage of fault of MPEA and Mr. Lindroth. And we don't believe that the percentages of fault for Mr. Lindroth at 35% against GES would be the same as for MPEA. Why wouldn't GES, why wouldn't Global be in there on the percentages of fault, too? It has to be. It would have to be the fault, the total fault, including the fault of the plaintiff, of all parties liable. Well, I think that Global would be, MPEA would be entitled to a set-up. But a jury has found, and assuming this court affirms, they have found that GES is at fault and that their fault compared to Mr. Lindroth. That's after having found that Metropolitan Superior wasn't at fault at all. And that was on a willful and wanton circumstance. But if it were to go back on negligence, a jury would have the right to say, well, okay, if Metropolitan Peer was negligent, and first they've got to decide that. Yes. Then they've got to determine if Metropolitan Peer is negligent, Global is negligent, and the plaintiff is contributorily negligent, what are the percentages and who pays what? Global has already been found negligent. That's assuming you find, you affirm, negligent. Liability, I'm not a problem with liability. I'm a problem with percentages of fault. Okay, we were thinking, and I see your point, we had thought about it differently. We had thought that MPEA would be entitled to a set-up, that Global would be out of the picture, and it would be like an empty chair defense. They're out. Global has already been found negligent. There, there. That finding is over with. Yes. The plaintiff has been found contributorily negligent. Their finding is over with. Now you've got a situation. Hold on a second. Okay. He's been found contributorily negligent. Now you have a situation as to whether Metropolitan is or is not negligent. If Metropolitan is negligent, then in that particular case the jury has better set the percentages of fault of each of the parties, including the contributory fault, percentage-wise of the plaintiff. It's something, but nobody knows what. You can only have 100 percent fault. Yes. So it can't be larger than 100 percent of them. So you can't turn around and say Global is 65 percent, the plaintiff is 35 percent. Right. Right. It doesn't matter. So what you have to do is you have to say, plaintiff is contributorily negligent, jury. Global is negligent, jury. Finding's already made. Yes. Going to get a trial on Metropolitan. And if you find that for the plaintiff is against Metropolitan, then you've got to discern what percentage Metropolitan's fault is of 100 percent, what percentage Global is of 100 percent, and what percentage the plaintiff is for contributory. It's the only way you can make 100 percent. Well, we could, well. That's exactly what would have happened if Metropolitan had been in the beginning. Yes, it would have been. But now we have this finding of liability and the determination of damages. Why make an empty chair? Fine. You've got liability as to Global. You've got contributory negligence as to the plaintiff. And you've got fixed damages. Yes. You've just got a player here that's got to be figured in for percentage wise if he's liable. We were thinking, I mean, we were thinking that it would be, that it would be comparing Metropolitan and Mr. Lindroth. I'm far from a contributor claim, I guess. Yes, they do. Yes, they do. What do you do with it? Well, that would be in the case. But I think the GES would just be an empty chair like a pretrial settlement. It's a judgment, but I think it would be like that. GES is going to want to dump this off on Metropolitan Peer as hard as they can. Well, maybe, maybe not. That's a very interesting point. They did not do that at trial. They did not dump on, GES did not dump on MPEA at trial, and MPEA did not dump on them. What?  There was the same sort of thing. I'm looking at my crystal ball. I don't think they're going to take that position. That's the wrong one. Well, if it's the same insurance carrier, they may. And it very well may be that if we get a new trial, this whole thing will just settle and go away, and they will kick in some money. That very well may be. So, it seems to me that that would be a question for the trial court anyway. Well, are you going to discuss the question of whether it was proper to grant the summary? That's what I would like to get to. Let's get to that. It was wrong. Why? Because the bottom line is, if Mr. Caruso is a supervisor, we are all supervisors. He doesn't have to be a supervisor. He has to be engaged in supervisory activity. He has to be engaged in supervision, which, according to the Supreme Court, can even be ministerial acts. Absolutely, absolutely. But doesn't there have to be somebody that they're supervising? How about he was supervising the activity of driving on public property? I don't think he was. Why not? Why? He was directing traffic. He was. Very minimal. Very minimal. Actually, there's testimony that he wasn't even directing traffic in this case. There were times it came every few minutes. It was not traffic. This isn't like a worker standing on a highway with a slow sign. But that's exactly what you allege he didn't do when the plaintiff was injured. He... Was improperly directing traffic. Well, what he was doing on his job was, it was certainly ministerial. His job involved... Stop a minute. Do you actually think directing traffic is a ministerial duty? There's no discretion. No. And when you let a car go and when you don't let a car go? On a highway, it's not ministerial. If you're working on a highway and there's a worker there with a slow sign and a stop sign, you're making decisions. You're saying, hmm, who should go first? Who should stop? That is not what was happening here. That is... That would be a different case. What we have here is a guy who comes out of his booth and checks a license plate and says, well, it's on your license plate. Who are you? You can go up now. That is not... It's not like he says, who? Do I have the right? Let's agree with you there, Trevor. What about misdirecting them into the wrong lane? He has no right to do that. Well, not according to Causton. Causton, McGirr's own general manager, testified that Caruso's duties included making sure that traffic proceeded safely up the ramp. The duties are listed. I'll tell you this, Exhibit Number 12, which appears in the Record of Volume 123, page 24. It says the primary responsibilities for the officer assigned to any of the ramps are as follows. Coordination of semi-traffic and vehicular traffic. Ensure all traffic going up the ramps has proper dock passes. Properly fill out all ramp forms. Ensure no unauthorized vehicles go up the ramps. Remain alert for potential troublemakers. Maintain a professional appearance and demeanor and remain on post until properly completed. And what was the first duty? The first duty is coordination of traffic, vehicular traffic. Is coordination of traffic directing traffic? Is that another way of saying directing traffic? I don't think this really counts as traffic. That's the bottom line. I can't disagree with you. It's coordinating traffic, and you have to have, to be supervising something, it seems like it has to be more. This is like, is a tollbooth operator engaged in supervisory activity? That's what he was like. You keep saying supervisory activity. The Supreme Court was very clear in Epstein. They don't need to be supervisors in the managerial sense. There is nothing in 3-108 that suggests that even ministerial acts aren't included. They must be engaged in some form of supervision. Right. Now, if you're a supervisor in a managerial sense, you're wrong. I'm not saying that. Okay. If you want to say that he that engages in supervising something is a supervisor, well, okay, we'll agree on that. But if he's supposed to be directing traffic, that is supervision of vehicles. I would agree that if you were on a roadway and there was real traffic, if there was real traffic, that could be deemed supervisory. Well, what were those things that he directed around the post after the scooter? Those were occasional vehicles that were sent from the marshalling yard down into the ramp to go up to the dock. They were all coordinated. He was a participant. He was more like a participant, like in Longfellow, where the teacher lost his supervisory immunity, but he started participating in a game of tag. Our guy here, Mr. Caruso, is not doing anything involving real traffic. Let's talk about what 3-108 says. It says, to supervise an activity on or the use of any public property. And are you suggesting to me that when he directed the vehicle around the toll booth, he wasn't indicating how the use of public property should be managed? Is supervising and directing and monitoring, are they all interchangeable? I think they're symbols. That's where we disagree. I have to say he's monitoring, directing, supervising, because it's not. Because there's nothing he's... All he's supposed to do, really, is make sure that they belong there, make sure that he gets there on time. Make it traffic. That was the first one you brought. But there's no traffic. There was. There were cars. Two of them. Isn't that what you say he was doing? Well, it's traffic. I mean, it's traffic. Does traffic... Is there traffic when there's one car every five minutes? Well, the only thing different between him and a policeman standing out on the street corner out here on Randolph and LaSalle waving his arms is the quantity of cars that are now passing by. I disagree. I absolutely disagree. Because a police officer on LaSalle is actually making... There is more discretion there. It's not ministerial. And I know that it can be ministerial. What's your definition of ministerial? A job where you have no discretion, where you're just doing your flipping burgers. If I see a car go around that gate or don't go around that gate, that's discretion. And I don't know how he made it. It's discretion. He didn't have that discretion. No, he did. He did it, but he didn't have the discretion to do it. But he was supposed to coordinate the vehicles. Isn't that coordination of the vehicles? Going around double yellow lines? I don't know. I mean, obviously, you disagree. Yeah. Thank you very much. That's all I have to say. Thank you. A farmer's life. May I please recall, farmers, ladies, on behalf of the Metropolitan Peer and Exposition Authority, we'll just call it McCormick site because everyone here has sought this litigation. I'd like to say, I guess with the plain language of the Tort Immunity Act, I think the court clearly understands that there's immunity for supervising an activity or the use of public property. We submit there is sufficient evidence here to establish that that's precisely what Caruso was doing. He was directing the traffic. And we know that the case log basically says that supervision of an activity includes implementing, coordinating, directing, overseeing, regulating. And I think that's clear that's exactly what Caruso was doing. He was controlling the access to the facility and who could use that property because he was checking for the credentials to make sure that only credentialed vehicles could actually access the loading docks. And I think that sits squarely within the type of conduct that the Tort Immunity Act applies to. Does it make a difference that he allegedly wasn't doing his job correctly? No. I mean, immunity is looking at what is the function of the conduct. Well, it wasn't his function to direct people into the wrong lane so they'd get hit by incoming traffic, was it? Let me ask this question. What would be the purpose of immunity if it wasn't to exculpate one from their wrongful conduct? I mean, that's exactly the point. I mean, you're immune from the activity that you're undertaking, and clearly it's unlikely that you're going to face liability unless something goes awry here. Now, I don't think the record actually supports the allegation that he was directing traffic to drive off the wrong lane. What he was doing, and he explained the rationale. This was not, and the plaintiff says he was lazy and didn't want to move over, but he actually, Caruso testified to the rationale for why he had the gates set up the way they were. They had a lot of people who'd get lost there thinking they were flying onto Lakeshore Drive. And so he was preventing people from just accessing the property quickly by going up the northbound lane. So he thought this was actually the safest way to conduct the traffic and control access, which was his job on site, and he'd done this for two years without any incident. And I think it is analogous to if you're driving on a roadway and somebody's double parked, maybe there's a cab discharging a passenger, and you drift into the other lane to get around them, or maybe there's just a standing car that's stalled there and you have to get around. He was not directing people to drive up the wrong lane of traffic. So I think that's a real mischaracterization of what was actually happening. They were jogging around the gate and then going back into their lane and proceeding up the northbound lane as they were intended to. But I think the totem in the act clearly applies to exactly what was happening here. I think there's a legion of cases that support the fact that if you're controlling access to the property or the use of the property or the activity of the traffic, which traffic controls an activity on the public property, true immunity applies. And I don't think the plaintiffs have studied a single case at all that even disputes that fact. And I disagree that Caruso was like the school caretaker on one side. He was not participating. He wasn't driving in the traffic. He was literally doing his job, which was to control access to the dock. And I think that fits squarely within the Tort Immunity Act. I'd like to address quickly, I don't want to go over my time, hopefully this court is not going to reverse and find that tort immunity doesn't apply to Mr. Caruso's conduct. What we've been asked to look at is whether there was material issues in the fact, isn't there? Yes. And I don't believe there are. I believe that it's undisputed what he was doing. And I think you sense the tension. I mean, in order to state a claim against Mr. Caruso, they had to complain that he misdirected the traffic. He was not adequately controlling the traffic, which puts it right back into the Tort Immunity Act. And then, of course, honestly, on the Wilson and Wharton, they didn't really argue that, the manifest weight. But I think the jury heard this evidence. This is a classic case of, I think, a credibility dispute between Bjorklund's testimony and Caruso's testimony. Caruso testified that the second vehicle for which Bjorklund claimed he had to avoid and hit the wall when Mr. Lindroth fell off the cart, Caruso testified that that vehicle was still at the gate at the time he heard the crash. The jury heard all this evidence and just clearly, obviously, found that either the accident did not happen in the manner in which plaintiffs presented the evidence, and that Caruso did not act willfully and wantonly, or they could have believed that nothing Caruso did actually approximately caused the accident, because it does appear that, according to Caruso, that car was still at the gate at the time the accident occurred. So we would suggest that there's just no reason to actually disturb that finding. As far as the relief, that was one of the things we struggled with, because we were unclear exactly what plaintiffs were looking for in the case. They did say J&OV on a claim that hadn't been tried, so that was not possible. We, I think, would agree that if there was a new trial, I'm just responding to your question, so we don't think that would be the proper result here. In order to assault allocation, we really struggled with this as well, because plaintiffs have not appeared from the finding of comparative faults from Mr. Lindroth, so I'm not even sure that that is open for reconsideration if there had to be a new trial. But I agree with Justice Hoffman. You can only have 100 percent faults for any given accident. I think part of the problem is that oftentimes you don't have all the players, and it's difficult to figure that out. But there really should only be 100 percent faults. I think that would include Caruso as well, and I think it would necessarily include GES. I don't really know how you could start a new trial with GES at 65 percent, the plaintiffs at 35 percent. There's nothing to allocate. That's 100 percent. So hopefully this court really is not considering a new trial. We don't really think there's any grounds for that with respect to McCormick-Peer. And unless you have any further questions, we would respectfully request that you fund that, the judgment in their favor. Thank you. And finally, plaintiffs have two minutes. Well, just briefly, Coastal could never be considered if a new trial is granted as MPA. Coastal could never be considered in a verdict form as one of the negligent parties because it's only a third-party defendant, and that wouldn't be right at all.  If we go back for a new trial, McPeer is going to want third-party action against Coastal also. Yes, they do. But that doesn't mean they go on the regular verdict form is all I'm saying. Somebody must figure out what the percentages are that only add up to 100. Correct. The 100 will be decided between the two defendants and the plaintiff's comparatives. Right. Thereafter, if there's contribution claims, there's another form for that. You cannot put Coastal on with the verdict form for the plaintiff. That's all I'm saying. I believe Ms. McElhady has just suggested otherwise, and that can't be. No, but what she's suggesting is if it goes back to a trial, you can't leave Global at 65% and the plaintiff at 35% because there is 100. Right. Frankly, I thought that Global would be out, as I said, and that they would be entitled to a set-off of the amount that Global paid. They'd be like an empty chair, and there would be a discussion of— Why would it be a set-off as the amount that Global paid? Because there's always going to be an affirmed judgment against Coastal. You're suggesting that the contribution claims, yes, between Metropolitan and Global— No. —but if it goes back for another trial, there will be— No, I don't think so. Why not? There's no reason to think there would be. There was none before. Well, wait a minute. Hold on, hold on. Why would there be an option to do that? If they send this thing back on the negligence pile, there has never been a trial on negligence. Metropolitan period has never been in a case where it was accused of negligence that went to trial. So now you've got a situation where you've got 100% liability, and it's got to be determined if they're back in between Metropolitan, Global, and the plaintiff. That's got to get up to 100%. Now you have to determine, as between the joint tort pleasers and the employer, what are the percentages of liability to determine contribution? Yes. Do you think McPeer is going to say that if we pay more than our assigned liability under a negligence verdict, we're not entitled to contribution from a joint tort pleaser? Yes. Who doesn't pay theirs? Yes. Well, first of all, they would have paid theirs, and they would have got a set-off. What makes you think they'll have paid theirs? Because if this court affirms the judgment against GES, and let's say no PLA is granted, they have an obligation to pay, and they will do so. But we have to send it back for a trial for the percentages. There's no question about that. I think you could send it back with a set-off of the amount they pay, and it would be just like a settlement pre-trial if somebody paid. And I want to just speak up for myself here, because if you look at the IPI verdict forms in the 600 series, everybody's percentage is there, including the third-party defendant. And so I think you'd have to put everybody. There wasn't a form. There wasn't a form. Here's B. In my mind, it wasn't a proper form. Be that as it may, there was MPEA and GES were both in the case. MPEA went to trial against Wolf, Ungrothal, and Watton. It could have been that they were found liable. They weren't, but there was no counterclaim, no cross-claim filed by either of them before. Okay? So why did they get to file one now? It was in the discretion of the trial court, but I don't think it was at all. They would certainly have a right to go against Coastal. Absolutely. No question about that. They both had counterclaims. They had third-party actions against Coastal. Nobody ever, neither of the defendants, ever filed third-party claims against or cross-claims against each other before. They did not point their fingers. By your thinking, I would guess they would have been pointing their finger at each other at trial, but they weren't. That tells you something. Because if MPEA came in on negligence, that's a different trial strategy than when they're in on Wolf or Watton. What's that? When there's a dispute as to whether this action ever even happened in the fashion in which the plaintiff suggested it. Okay. This case, when summary judgment was granted to McPear-McClay complaint, it's a fourth-amended complaint. The case had been pending for a number of years already. But was it with negligence? With negligence. At no time while that claim was pending was there a cross-claim file. You're telling me that's because they're insured by the same carrier? I am telling you that. And what about the amount that McPear goes naked before their insurance company gives over? What about it? Because I doubt that they're insuring from dollar one. I don't know. I'm just telling you the case was pending for years, and there were no cross-claims filed. And there was no finger-pointing. You would think even at trial, thinking it was just a Wolf or Watton claim against MPEA, GDS would have been smart perhaps to point their finger at MPEA. They could have done so. So this is really their fault. I don't know what the strategy was, and I don't even want to try to guess. Well, I'm just saying, I agree. But I'm not saying that you don't necessarily have a right to file a claim against each other if the case is pending. Well, that's something the trial judge would determine. That's my point. That's my point. As to Epstein, by the way, Epstein was decided. It was a question of whether there was immunity that was allowed. And the immunity trumped the Structural Work Act. And that's the real holding of the case. Some awfully broad language in that case. Yes, there is. But that case also was, they affirmed the appellate court's ruling on the immunity, but then they reversed. They did. Yes, so it's that question of perhaps there was, it wasn't merely supervision. Merely was the word, which is interesting because in other cases, their language would say adequacy of supervision is not, isn't immunized. And you're talking about, you think this might be adequacy. I don't think it's adequacy. I think there's no supervision. I think under your analysis, you might say that a tollbooth operator takes the money and opens the gate. That's what he or she does. Is that supervisory immunity? He doesn't supervise the traffic and tell the traffic when to go around gates. Well, let's put it that way. Let's put it that way. If a tollbooth operator gets out of the tollbooth and tells the driver, go around the booth, he may very well be directing traffic and might be supervising traffic on an arterial road. You know, that might be because there is some thinking and there's some problem. This isn't that kind of case, though. This is, I mean, I understand your position, but my position is there was no, there certainly was no discretion, he certainly had no authority, he was certainly acting outside of his authority, and it wasn't supervisory. It was just done. Thank you. Thank you all. I will take the case under insight.